**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE ONE; JOHN DOE TWO; JOHN DOE THREE; and JOHN DOE FOUR, on behalf of themselves and all similarly situated individuals, | No. 2:18-cv-00238-EAS-CMV |
| *Plaintiffs,* | No. 2:18-cv-00488-EAS-CMV |
| v. | (Consolidated for all purposes) |
| CAREMARK, L.L.C.; FISERV, INC., FISERV SOLUTIONS, LLC; and DEFENDANTS DOES 1–10, | <u>CLASS ACTION</u> |
| *Defendants.* | |

**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL**
**OF CLASS ACTION SETTLEMENT**

## I.    INTRODUCTION

Plaintiffs John Does One through Four (hereinafter "Plaintiffs" or "Class Representatives") filed this class action lawsuit on behalf of themselves and all individuals enrolled in the Ohio HIV AIDS Drug Assistance Program ("OhDAP[1]") who were sent a mailing in August 2017 with the letters "HIV" in a program code displayed directly above their names and addresses, which could be viewed through a regular glassine envelope (the "OhDAP Mailing"). As a result of the OhDAP Mailing, Plaintiffs' Consolidated Amended Class Action Complaint alleges that Defendants Caremark, L.L.C. ("Caremark"), Fiserv, Inc. and Fiserv Solutions, LLC (collectively, "Fiserv," and with Caremark, the "Defendants") unlawfully disclosed Confidential HIV-related Information of Plaintiffs and approximately 4,500 Settlement Class Members and, after this Court's Order on Defendants' Motions to Dismiss, Dkt. No. #59, asserts claims for (1) the unauthorized, unprivileged disclosure to a third party of nonpublic medical information (a "*Biddle* claim"), (2) violation of Ohio Rev. Code § 3701.243, (3) violation of Ohio Rev. Code § 3904.01, and (4) and declaratory relief.

Plaintiffs and Defendants, through their respective counsel, have entered into a Settlement Agreement ("Settlement" or "Settlement Agreement"), which is attached as Exhibit 1 to the Joint Declaration of Henry Quillen and Matthew Wilson ("Decl."). The Settlement Agreement will create a non-reversionary cash settlement fund of $4,400,000, which will provide substantial, meaningful and immediate benefits for all of the Settlement Class Members. The underlying purposes of this lawsuit have been achieved by the Settlement by providing both: (1) direct compensation of *at least* $400 to all Settlement Class Members *without* the necessity of filing a

---

[1] Capitalized terms have the same meaning as set forth in the Settlement Agreement unless otherwise stated.

claim and *also* providing Settlement Class Member's the ability to make a claim for up to an *additional* $12,500 for monetary losses and emotional distress per person; and (2) modifying the OhDAP program code to remove the letters "HIV" and providing medical privacy training to its employees who manage the OhDAP relationship. The terms of the payment allocation and claims process are detailed in the Settlement Agreement and are described more fully below. The Settlement Agreement and administration process use special, comprehensive methods to protect Confidential HIV-related information. Settlement Class Members who choose to do so may submit claims by mail or via the Internet via a HIPAA-compliant secured web portal.

Counsel for Plaintiffs respectfully submit that the terms of the Settlement Agreement are more than fair, reasonable, and adequate, and should be preliminarily approved.  Indeed, Plaintiffs submit that this Settlement is an excellent result for plaintiffs in patient privacy class actions and compares favorably with many other federal court-approved settlements in comparable cases.  At this first stage of the settlement approval process, Plaintiffs respectfully request that the Court enter the proposed Preliminary Approval Order attached as Exhibit B to the Settlement Agreement, which will among other things: (1) certify the proposed Settlement Class pursuant to Rule 23(e) of the Federal Rules of Civil Procedure; (2) appoint Whatley Kallas, LLP, Meyer Wilson Co, LPA, The Law Offices of Terry L. Kilgore, and Kaplan Fox & Kilsheimer, LLP as Co-Lead Settlement Class Counsel; and Consumer Watchdog and Lambert Law Firm, LLC as Class Counsel, and the Plaintiffs as Class Representatives; (3); approve the proposed Notice of Settlement and Short Form Notice (attached as Exhibits C and D to the Settlement Agreement) and proposed notice plan; (4) approve Heffler Claims Group as the Settlement Administrator to provide notice and administer the Settlement; (5) enter a Qualified Protective Order in accordance with the requirements of HIPAA and relevant state law and order Caremark to provide the Class List to the Settlement

Administrator; (6) set a date for Plaintiffs to file a motion for final settlement approval and petition for an award of attorneys' fees and costs, payment of Settlement Administrator fees and costs, and service awards to the Representative Plaintiffs; (7) schedule the Final Approval Hearing for final settlement approval; and (7) preliminarily find the terms of the proposed Settlement Agreement fair, reasonable, and adequate.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

The Ohio Department of Health ("ODH") administers OhDAP, which provides "medications to fight HIV and to treat HIV-related conditions" free of charge to Ohio residents who have a confirmed diagnosis of being HIV-positive. Dkt. # 74, ¶¶ 13–15. In 2017, ODH entered into an exclusive contract with Caremark for Caremark to provide pharmacy benefit management services for the provision of life-saving HIV medications to OhDAP participants. *Id.* ¶ 19.

In August 2017, as part of its administration, Caremark, via subcontract with Defendant Fiserv, sent the following "welcome letter" to program participants:



*Id.* ¶¶ 9, 21. The OhDAP Mailing contained information concerning Caremark's management of

---

[2] Defendants deny all substantive allegations in the Consolidated Complaint, including those described herein.

OhDAP and explained how participants would access their HIV-related prescriptions. *Id.* ¶ 20.

In issuing the OhDAP Mailing, Plaintiffs allege that Defendants violated Ohio's statutory and common law medical privacy protections by: (1) unlawfully providing the names and addresses of approximately 4,505 OhDAP participants to Fiserv, but without ODH's or Settlement Class Members' prior approval; and (2) by disclosing Confidential HIV-related Information to third-parties in the way the OhDAP Mailing was issued.[3]  More specifically, in the transparent window on the line above the recipient's name and address, "PM 6402 HIV" was displayed under the statement in red text that "Your new prescription benefits have arrived."  Plaintiffs allege that the information in the top left window makes it clear that the OhDAP Mailing is from both CVS/Caremark and ODH. *Id.* Thus, Plaintiffs allege that anyone exposed to the letter (such as family members, roommates, neighbors, mail carriers, and others), without even opening it, would (1) know that the communication was at the behest of the ODH; (2) the communication related to "new prescription benefits" and (3) the communication referred to "HIV" directly above the patient's name and address.  *Id.* ¶ 22. Plaintiffs allege that someone seeing this letter would thus be able to reasonably infer the individual was part of a state-sponsored medication benefits program managed by Caremark to obtain HIV medications. *Id.*

On March 21, 2018, Plaintiffs John Does One through Three filed an action on behalf of a class of those who received the OhDAP Mailing against various Caremark entities, Fiserv, Inc., and Doe Defendants. (Dkt. #1). On May 16, 2018, Plaintiff John Doe Four filed *John Doe v. CVS Health Corporation et al.*, No. 18-cv-488 (S.D. Ohio), alleging similar and additional claims on behalf of the same class. On June 13, 2018, the cases were designated as related. (Dkt. #40).

---

[3] Based on publicly available information about OhDAP and the Mailing, the Plaintiffs alleged that approximately 6,000 people received the Mailing. The actual number of Class Members is 4,505. See Declaration ¶ 11.

4

Defendants moved to dismiss both cases pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. #29, 33). While the motions were pending, the Plaintiffs and Caremark participated in mediation on October 24, 2018 with the Honorable James R. Melinson (Ret.) of JAMS in Philadelphia. Declaration ¶ 4. The participating Parties did not reach settlement. *Id.* The motions were fully briefed, and on December 21, 2018, the Court issued a consolidated ruling, permitting Plaintiffs to proceed on their Ohio-based statutory claims, their common-law *Biddle* medical privacy claim, and seek declaratory relief. (Dkt. #59). The two matters were formally consolidated on January 17, 2019 (Dkt. #65), and thereafter, the Plaintiffs filed the Consolidated Complaint. (Dkt. #74). Defendants filed their Answers to the operative Complaint on March 20 and April 5, 2019 (Dkt. #79, #80), asserting numerous affirmative defenses and maintaining that class certification would be inappropriate.

During and after the pleading motions and consolidation, the Parties engaged in thorough discovery, exchanged initial disclosures and written discovery requests and responses, and negotiated a comprehensive HIPAA-compliant protective order. Declaration ¶ 5. Defendants ultimately produced over 1,200 pages of documents in response to Plaintiffs' requests, including: (1) documents identifying the size of the Settlement Class, and (2) documents regarding the OhDAP Mailing. *Id.* The Parties also spent a significant amount of time negotiating a discovery protocol, a custodian list, and targeted search terms in order to obtain email and other documents responsive to Plaintiffs' requests, during which Plaintiffs obtained valuable information on the roles Defendants and their employees played regarding the OhDAP Mailing.

Plaintiffs also conducted an intensive, independent factual investigation of the claims. *Id.* In addition to speaking with many Settlement Class Members regarding their experiences with the OhDAP Mailing, Plaintiffs subpoenaed ODH for the relevant information and reviewed

documents obtained under Ohio's Open Records Law. The resulting productions of more than 1,200 additional pages of documents provided additional, new information about OhDAP Mailing. *Id.* Collectively, Defendants' and ODH's document productions provided Plaintiffs with more than a sufficient means to further assess the strengths and weaknesses of their claims prior to the time the parties agreed to and participated in a second mediation. *Id.*

On May 9, 2019, Plaintiffs and Caremark participated in a second mediation with the Honorable Morton Denlow (Ret.) of JAMS in Chicago. The mediation included extensive negotiation as well as the informal exchange of relevant information. *Id.* ¶ 6. All negotiations between Caremark and Plaintiffs were at arm's-length and hard fought. *Id.* At the end of that mediation session the parties executed a detailed term sheet. The Parties then spent months working through the details of the Settlement, including the proposed distribution of the settlement funds and the notice procedures set forth below. The Parties spent a tremendous amount of time working through logistical challenges presented by the privacy issues implicated in this case to ensure no loss of or access to Confidential HIV-related Information. On September 9, 2019, the parties executed the Settlement Agreement. *Id.*

## III.    THE PROPOSED SETTLEMENT

### A.    The Settlement Class

Plaintiffs and Defendants have stipulated in the Settlement Agreement and request the Court certify a class under Fed. R. Civ. P. 23(b)(3) for settlement purposes only defined as "all persons to whom the OhDAP Mailing was mailed, provided, or sent for delivery as identified on the Class List." "Class List" is defined as "the list provided by Caremark to the Settlement Administrator containing the names of all Settlement Class Members, along with their last known addresses received by Caremark from OhDAP and any other appropriate identifying information."

6

### B.    Settlement Fund

The Settlement Agreement requires Caremark to establish a non-reversionary Settlement Fund of $4,400,000, to be distributed as follows: (1) an automatic Base Payment of $400 to each Settlement Class Member *without* the need to file a Claim Form; (2) each Settlement Class Member may submit a Claim Form for up to $10,000 in Financial Harm, which includes, for example, any moving costs, counseling costs, loss of income, or other non-reimbursed out-of-pocket expenses upon a showing of reasonable proof resulting from the OhDAP Mailing; (3) each Settlement Class Member may also submit a Claim Form for up to $2,500 in Non-Financial Harm, such as emotional distress or disclosure of HIV status to roommates or employers, based on a questionnaire set forth in the Claim Form; (4) Class Representative Service Awards of $3,500 for each of the four Class Representatives; (5) costs of the Settlement Administrator (estimated to be $120,000); and (6) attorneys' fees of up to 33 1/3% of the Settlement Fund, plus costs of litigation. Should there be excess funds in the Settlement Fund after payment of the items above, each Settlement Class Member's Base Payment of $400 shall be *increased* on a *pro rata* basis.  If the amount of potential Claimant Awards for those Class Members who submit claims exceeds the apportionment of funds set aside for Claimant Awards, then *only* the Claimant Awards will be reduced on a *pro rata* basis. There is no circumstance in which the automatic Base Payment be reduced to less than $400. Decl. ¶ 11.   Finally, if it is not administratively and/or economically feasible to make a *pro rata* distribution, then Plaintiffs' counsel will make an application to the Court to approve a final distribution of any remaining funds to a *cy pres* entity, which recommendation shall be mutually agreed upon by the Parties. A detailed description of the distribution of the Settlement Fund is set forth in Exhibit H to the Settlement Agreement.

### C.    Non-Monetary Relief

Plaintiffs also negotiated implementation of changes with Caremark, namely (1) revising

the OhDAP program identification number to remove the letters "HIV" and (2) providing medical privacy training to Caremark employees who manage the OhDAP relationship. Settlement Agreement, ¶¶ 5.1-5.5. Plaintiffs believe such changes enhance privacy protection going forward.

### D.     Administration Costs, Incentive Awards, and Attorneys' Fees and Costs

The Settlement Agreement provides that all costs of settlement administration will be paid out of the Settlement Fund. After a competitive bidding process from four companies, the Plaintiffs and Caremark have recommended the Court appoint Heffler Claims Group as the Settlement Administrator. In addition to Heffler's experience as a class action notice and claims processor, Heffler has specific expertise in cases involving sensitive privacy concerns, and Plaintiffs and Caremark have extensively worked with Heffler to develop a privacy sensitive plan for notice and administration that minimizes the possibility that a Settlement Class Member's HIV status will be disclosed.  These procedures are described in Exhibit G to the Settlement Agreement, and include, privacy-conscious mailing procedures; assigning a unique, anonymous class member identification number so that Settlement Class Members do not need to use their names when communicating with the Settlement Administrator; establishing protocols at Heffler that will avoid the disclosure of Class Members' names to other than a very limited number of personnel; the establishing a HIPAA-compliant web portal permitting Class Members to file claims online; and permitting Class Members to file objections or opt-outs without the disclosure of their identities publicly.  Heffler is ultimately responsible for ensuring that these protocols are properly implemented and executed.  See Declaration of James Prutsman ("Prutsman Decl.").

Plaintiffs' counsel will also request that the Court approve incentive awards for the Class Representatives in the amount of $3,500 per Plaintiff ($14,000 total). In addition, Plaintiffs' counsel will also petition the Court for reasonable attorneys' fees of no more than 33 1/3% of the Settlement Fund, which is consistent with the percentage of the common fund approach typically

applied by Courts in this District—as well as and costs of litigation.  Decl. ¶ 12.  Plaintiffs will provide all necessary support for their requested attorneys' fees and costs in connection with the final approval and attorneys' fees motions, the latter of which will be filed before the expiration of the Objection Deadline so that Settlement Class Members can comment should they so choose. Decl. ¶ 12.

### E.  Notice Plan

The Settlement Agreement provides for notice to the Settlement Class Members, including direct notice by U.S. first class mail in the format suggested by the Federal Judicial Center to virtually all Settlement Class Members. In keeping with the sensitive nature of this case, mailings will be made in opaque envelopes that do not reveal anything about the recipient's health status on the outside of the envelope and contain warnings that the envelope should only be opened by the intended recipient or addressee. Each Settlement Class Member for which an address is available will be sent the Notice of Settlement as well as a Claim Form, both of which carefully avoid any direct reference to HIV or AIDS.  Because there are a few dozen Settlement Class Members for whom no recent address is available, the notice plan will also: (1) provide ODH with copies of the Notice of Settlement to distribute to OhDAP caseworkers who can let current and former clients know about the settlement and where to get more information[4]; and (2) limited publication notice targeted towards the relevant demographics and community groups.

The Settlement Administrator will also: (1) establish a HIPAA-compliant Settlement Website (OhioPrivacySettlement.com) where the Settlement Agreement, Notice of Settlement,

---

[4] Address information will likely be available for more than 98% of Settlement Class Members. In addition, each OhDAP participant is assigned a social worker. Although ODH is not a party to the Settlement Agreement, Plaintiffs have secured its cooperation in letting OhDAP caseworkers know about the settlement so that they can encourage and assist Settlement Class Members with filing claims and potentially notify Settlement Class Members who are experiencing homelessness or may not have a current physical address on file with ODH.

and other relevant documents and orders will be posted *and* through which Claims can be submitted; (2) establish a dedicated, toll-free telephone number that Class Members can call to hear information regarding the Settlement and speak with a live operator who will be specially trained in the privacy concerns this case presents. All costs of disseminating the notice and setting up a settlement website will be included in the costs of settlement administration and will be paid out of the Settlement Fund.

### F.      Settlement Class Members' Releases

In consideration of the relief provided, Settlement Class Members will release their claims against Defendants (and Defendants' respective Affiliates) and ODH that result from, arise out of, are based upon, or relate to the Incident, OhDAP Mailing, the facts, circumstances, or allegations in the above-captioned litigation (i.e., in either 2:18-cv-238-EAS-CMF or 2:28-cv-00488-EAS-CMV), as set forth in greater detail in the Settlement. The Settlement does not release claims relating to actions taken after the Effective Date of the settlement. Settlement Agreement., ¶ 7.2.

### G.      Exclusion and Objections

Settlement Class Members may choose to opt out of the Settlement Class within 60 days after mailing of the Notice. Settlement Class Members may file an objection to the Settlement within 60 days after mailing of the Notice and can do so without disclosing their names publicly should they so choose. The Agreement permits Caremark to not go through with the settlement if a certain number of Class Members submit timely, valid opt out requests, which can be submitted to the Court.

## IV.      ARGUMENT

### A.      The Applicable Legal Standard

The settlement of a class action requires court approval. Consistent with Rule 23(e), district courts in this District and throughout the Sixth Circuit review class action settlement proposals

10

using a three-step process: (1) issuing a preliminary settlement approval order based on the submission of the parties; (2) disseminating notice to the class of the proposed settlement; and (3) conducting a fairness hearing after dissemination of that notice, "after which the Court must decide whether the proposed settlement is fair, adequate, and reasonable to the class as a whole, and consistent with the public interest." *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 547 (S.D. Ohio 2000) (citations omitted). With this motion, Plaintiffs request that the Court take the first step in the approval process by granting preliminary approval of the proposed settlement. This procedure, used by courts in this Circuit, safeguards class members' due process rights and enables the Court to fulfill its role as the guardian of class action interests. *See* Herbert V. Newberg & Alba Conte, Newberg on Class Actions, §13:1 (5th ed. 2018).

The preliminary approval of a proposed settlement is based on the Court's "familiarity with the issues and evidence of the case as well as the arms-length nature of the negotiations prior to the settlement." *Robinson v. Ford Motor Co.*, No. 1:04-CV-00844, 2005 WL 5253339, at *3 (S.D. Ohio June 15, 2005). The Court "should also determine that the settlement is neither illegal nor collusive." *Id*. If the Court later finally concludes after giving class members the opportunity to submit their views on the settlement that the settlement is "fair, reasonable and adequate," the Court finally approves the settlement. Fed. R. Civ. P. 23(e)(2). *See Stinson v. Delta Management Assoc.*, *Inc.*, 302 F.R.D. 160, 164 (S.D. Ohio 2014).

The Sixth Circuit has recognized "that the law generally favors and encourages the settlement of class actions." *Franks v. Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981) *on reh'g*, 670 F2d 71 (6th Cir. 1982). (citations omitted). Class actions and other complex matters are unique in that the inherent costs, delays, risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain.

**B.     The Proposed Settlement Is an Excellent Result for the Settlement Class, and There are No Deficiencies to Cast Doubt on Its Fairness.**

The Settlement Agreement exceedingly meets the standard for preliminary approval under Rule 23(e). Under the terms of the Settlement, the non-reversionary fund of $4.4 million will provide significant monetary relief to the Settlement Class. To compensate the Settlement Class Members for the alleged improper disclosure of their HIV status, every Settlement Class Member has the right to receive $400 out of the Settlement Fund *without* filing a claim, *and* the ability to claim up to $12,500, using simple and expeditious methods for doing so.

A comparison with the monetary recovery in a similar privacy breach case demonstrates the strength of this settlement. In October 2017, Aetna, Inc. entered into a class action settlement arising out of a similar alleged disclosure of HIV status in a mailing. Decl. ¶ 7. In that case, each class member who received the mailing automatically received a check for $500, as well as the ability to claim additional monies based on particular monetary losses and emotional distress they incurred. *Id*.

The amount automatically paid to Settlement Class Members in this case ($400) is commensurate to what was paid in the Aetna settlement ($500), and both offered claims procedures to claim additional compensation. Although the settlements were comparable and Aetna was approved *without a single objection*, there were some important, material differences between these two actions. First, and most significantly, Aetna settled the case almost immediately without even filing a motion to dismiss.  By contrast, multiple Defendants in this case vigorously contested the pleadings, and continued to strongly defend the lawsuit by engaging in protracted discovery negotiations and maintaining that the case would not be suited for class certification on Plaintiffs' untested legal theories.  Indeed, Plaintiffs are not aware of a prior case certifying a class action under either of the Ohio statutory causes of action at issue in this case or the Ohio common law

*Biddle* claim. Second, the Aetna case involved almost 14,000 individuals nationwide, garnered nationwide media publicity, and implicated statutory claims in other states that provided significant statutory damage awards (such as California's Confidentiality in Medical Information Act, Cal. Civ. Code section 56, *et seq.*) that were not available to Plaintiffs here. Third, there were some factual differences that Defendants in this case asserted would limit or obviate Plaintiffs' ability to recover, such as that the term "HIV" was being used as part of a group code, and thus Defendants' argued the OhDAP Mailing was not as a direct disclosure of the medications that the individuals were taking or of their HIV status in the same manner that was done in the Aetna matter. *Id.* Accordingly, given that Defendants were vigorously defending this case, that Plaintiffs' ultimate recovery is close to par with that in the Aetna case is all the more remarkable and demonstrative of the settlement's reasonableness.

In addition, the Settlement here exceeds what has been recovered in other medical and data privacy breach settlements. For example, this Settlement provides many multiples of the direct compensation than that available in recent multidistrict litigation over Anthem's massive data breach of medical information, which only provided credit monitoring services or $50 for each class member—and required them all to file a claim to obtain anything. *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617 (N.D. Cal.) (80 million class members and case settled for a $115 million, including nearly $40 million in attorneys' fees). *In re Target Corp. Customer Data Security Breach Litig.*, No. MDL 14-2522, 2015 WL 7253765 (D. Minn.) (settled for a $10 million total fund for breach of 97 million credit card numbers). *See also* Decl. ¶ 8.

Here, Settlement Class Members will automatically receive a settlement check of $400. This structure was established to recognize Plaintiffs' claim that the potential disclosure of Settlement Class Members' Confidential HIV-related Information to third-parties may have

resulted in significant distress and subjected them to potential discrimination and complications in their personal lives. The automatic $400 payment also recognizes that some Settlement Class Members may not want to submit additional personal information in order to receive funds from the Settlement. At the same time, as in the Aetna case, the Settlement here also properly provides an opportunity for individuals who claim to have experienced additional harm, such as out-of-pocket expenses for counseling, or emotional harm from unwanted disclosure of their HIV status to a friend or relative, to recover additional funds for their injuries. And, while an imperfect art, Plaintiffs believe they simplified the claims procedures from the Aetna matter and with the benefit of looking at the claims rates in related matters set appropriate maximum recoveries for Financial and Non-Financial Harm.

The Settlement represents an excellent result given the risks of continued litigation, which would require a substantial amount of time to yield any benefit to the Settlement Class Members. While Plaintiffs contend that they could ultimately establish that the OhDAP Mailing contravened Ohio law, this issue is far from certain and Defendants vigorously contest the claims asserted. Defendants denied any disclosure occurred and that any putative class member had been injured, among other arguments. These arguments would negatively impact the likelihood of class certification. These factors were all taken into account in reaching the Settlement Agreement. Decl. ¶ 13.

### C.    The Settlement Agreement Is the Product of Informed, Non-Collusive Negotiation After a Significant Investigation of Plaintiffs' Claims.

As part of the negotiation process, the participating Parties engaged in extensive negotiations and two full day mediations with former federal judges and experienced mediators. The successful mediation was conducted fairly and at arm's-length before an experienced mediator, Judge Denlow. Decl. ¶¶ 4,6. *Bert. V. AK Steel Corp.*, 2008 WL 4693747, *2 (S.D. Ohio

Oct. 23, 2008) ("[t]he participation of an independent mediator in settlement negotiations virtually insures that the negotiations were conducted at an arm's length and without collusion between the parties."). The terms of the agreement reached during the mediation before Judge Denlow were only arrived at after: (1) an early failed mediation, (2) review of key documents produced in discovery and obtained through an independent investigation; and (3) the ruling on Defendants' pleading challenges. Decl. ¶ 4. Thus, there is no dispute that the Settlement was reached on an informed legal and evidentiary record and via non-collusive means by an independent and highly regarded neutral.

## V. The Court Should Provisionally Certify the Settlement Class

In connection with preliminary approval, Plaintiffs request the Court certify for settlement purposes only the following Class under Rule 23(b)(3):

> **All persons to whom the OhDAP Mailing was mailed, provided, or sent for delivery, as identified on the Class List.**

### A. The Settlement Class Is Sufficiently Numerous

Rule 23(a)(1)'s numerosity requirement is met if the class is "so numerous that joinder of all members is impracticable." *Swigart v. Fifth Third Bank*, 288 F.R.D. 177, 182 (S.D. Ohio 2012). "There is no strict numerical test for determining impracticability of joinder," *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996), but courts routinely hold that "a class of 40 or more members is sufficient to meet the numerosity requirement," *Castillo v. Morales, Inc.*, 302 F.R.D. 480, 487 (S.D. Ohio 2014). The proposed class consists of 4,505 individuals.

### B. The Proposed Settlement Class Satisfies the Commonality Requirement

Commonality under Rule 23 "is satisfied when the legal question linking the class members is substantially related to the resolution of the litigation." *Swigart*, 288 F.R.D. at 183 (quoting *DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)). However, "individual class

15

members need not be 'identically situated' to meet the commonality requirement." *Id.* (quoting *Parkhill v. Minn. Mut. Life Ins. Co.*, 188 F.R.D. 332, 338 (D. Minn. 1999)). Here, the commonality requirement is met because the factual questions regarding the reasonableness of this settlement are the same. The claims of the Class Representatives and each of the Settlement Class Members are predicated on the same alleged conduct by Defendants—the OhDAP Mailing that disclosed the Plaintiffs' and Settlement Class Members' HIV status.

**C. The Claims of the Named Plaintiffs are Typical of the Settlement Class**

Under Rule 23(a)(3), "the claims … of the representative parties [must] be typical of the claims … of the class." *Swigert*, 288 F.R.D. at 185. Commonality and typicality "are separate and distinct requirements" but "tend to merge" and "are often discussed together." *Id.* (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.3 (1982)). Here, the typicality requirement is met because the claims of the Class Representatives and each of the Settlement Class Members are predicated on the theory that Defendants' conduct related to the OhDAP Mailing was unlawful. Accordingly, they each satisfy the typicality requirement.

**D. The Proposed Class Representatives and Their Counsel Are Adequate Representatives**

Rule 23(a)(4) requires that "the representatives parties will fairly and adequately protect the interests of the class." The two criteria for this are: "(1) the representatives must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Swigart*, 288 F.R.D. at 185-86 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).

As set forth in the attached declarations, Class Counsel are highly qualified and particularly suited to representation the Settlement Class in this case. The law firms of Whatley Kallas, Kaplan Fox & Kilsheimer, Meyer Wilson, and Consumer Watchdog have substantial experience in

consumer and data privacy class actions and have adequately represented the Settlement Class herein by avoiding potential conflicts of interest. Decl. ¶ 17. Additionally, Class Counsel Terry Kilgore has decades of experience representing individuals living with HIV in Ohio. There is nothing to suggest the Class Representatives have interests materially antagonistic to or that would irreconcilably conflict with those of the Settlement Class. Rather, all share a common interest in obtaining appropriate compensation and non-monetary relief for the Settlement Class. Plaintiffs Does One through Four have been diligent in prosecuting this case. These Plaintiffs risked subjecting themselves to scrutiny in their most personal matters by Defendants and the disclosure of their identities publicly, and have collectively spent dozens of hours assisting counsel, reviewed and approved the settlement, and otherwise kept apprised of the case developments. Decl. ¶ 17.

### E. The Settlement Class Satisfies the Predominance and Superiority Requirements of Rule 23(b)(3).

Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficient adjudication of the controversy." Rule 23(b)(3) contains two requirements: predominance and superiority. These claims satisfy both.

The predominance inquiry requires the Court to ask "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The predominance inquiry is about whether class-wide questions are at the heart of the litigation." *Powers v. Hamilton County Public Defender Comm.*, 501 F.3d 592, 619 (6th Cir. 2007). As described above, the Settlement Class members' claims are founded upon common questions of law and fact. Thus, a common question that can be answered for all class members predominates over any individual questions. Any individualized questions regarding damages do not defeat the predominance requirement. *See Beattie v. CenturyTel, Inc.*, 511 F.3d

554 (6th Cir. 2007) (where liability can be determined on a class-wide basis, common issues predominate even when there are some individualized damage issues).

The superiority requirement of Rule 23(b)(3) requires the Court to find that a class action is superior to other available methods for the fair and efficient group wide adjudication of the dispute and lists four factors for the courts to consider: (1) the interests of the class members in individually controlling the prosecution of separate actions; (2) the extent and natures of other pending litigation about the controversy by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the difficulties likely to be encountered in the management of the class action. Fed. R. Civ. P. 23(b)(3). Each factor weights in favor of certification of the Settlement Class for settlement purposes.

There is no evidence that the Settlement Class Members have any interest in maintaining this litigation in separate actions. Indeed, the only two separate actions that were filed arising out of this issue were consolidated into this action. The Settlement Agreement and Rule 23 mechanism allows the putative class members to preserve the medical privacy that was alleged to have been breached by the OhDAP Mailing while also reducing burdens on the courts from having individual adjudications. In addition, due to the relatively small size of the claims at issue, very few persons would have an interest in filing and controlling the prosecution of separate actions individually.

## VI. The Proposed Notice Provides Adequate Notice to the Settlement Class Members and Satisfies Due Process.

The U.S. Supreme Court has held notice of a class action settlement must be "reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). Pursuant to Rule 23(c)(2)(B), the notice must provide:

> The best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must

18

> concisely and clearly state in plain, easily understood language: the nature of the action, the definition of the class certified; the class claims, issue, or defenses; that a class member may enter an appearance through counsel if the member so desires; that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and the binding effect of a class judgment on class members under Rule 23(c)(3).

The content of the proposed notices, attached to the Settlement Agreement as Exhibits C and D, conforms to the Federal Judicial Center's guidelines for class action notices, complies with due process and all of the requirements of Rule 23.

The proposed notices of Settlement and the manner of distribution negotiated and agreed upon by the parties in the Settlement Agreement is the "best notice practicable" as required under Rule 23(c)(2)(B), and is designed to ensure as many Settlement Class Members as reasonably practicable actually receive the notice. The notice will be sent to nearly all Settlement Class Members by first class mail, and also published in specifically designated publications intended to reach the target population. Prutsman Decl. ¶ 15; *see* also Settlement Agreement, Ex. D (publication notice). Caremark has received address information provided by OhDAP for the vast majority of the Settlement Class Members. Plaintiffs have secured ODH's cooperation in letting OhDAP caseworkers know about the settlement so that they can assist Settlement Class Members as well. The proposed Notice provides clear and accurate information regarding the principal terms of the Settlement, including the relief the Settlement will provide to Settlement Class Members, the procedures and deadlines for opting out of the Settlement or submitting objections, the consequences of the various options available to Settlement Class Members, and will contain the date, time and place of the final approval hearing. In addition, information regarding the Settlement and the Complaint, the Settlement, the Class Notices, and other relevant documents will be posted on the Settlement Website.

To provide notice, communicate with Settlement Class Members, and (eventually) disburse settlement payments to Settlement Class Members, the Settlement Administrator needs a copy of the Class List from Caremark. The Class List will contain the names of all Settlement Class Members, along with their last known addresses received by Caremark from OhDAP and any other appropriate identifying information. This confidential information may contain Protected Health Information ("PHI"), as defined by the HIPAA in 45 C.F.R. § 160.103, or other confidential information protected by applicable federal and state privacy laws, including O.R.C. § 3701.243. The proposed preliminary approval order contains a proposed qualified protective order (as defined under HIPAA) that is intended to comply with the requirements of HIPAA and applicable HIV/AIDS confidentiality protections, including but not limited to Ohio Revised Code § 3701.243, which provides that a "party may seek authority for the disclosure" of HIV-related information by filing a motion which may be granted if the Court "finds by clear and convincing evidence that a compelling need for the disclosure has been demonstrated." O.R.C. 3701.243(c)(2).  Plaintiffs request that the Court issue the Qualified Protective Order based on clear and convincing evidence of a demonstrated compelling need for Caremark to disclose the Class List to the Settlement Administrator to effectuate the Settlement and provide Settlement Class Members with the benefits of the Settlement.  The proposed Qualified Protective Order therefore specifically orders Caremark to disclose the Class List to the Settlement Administrator.

The notice program is also designed to maximize the privacy of Settlement Class Member, with the Parties and the Settlement Administrator implementing unique, comprehensive procedures designed to ensure that the administration of the Settlement does not result in a disclosure of a recipient's health information, and places appropriate limits on the parties' counsel from learning any more about a claimant than is necessary to administer the Settlement.

## VII.    CONCLUSION

For the above reasons, Plaintiffs request the Court issue the preliminary approval order

(Ex. B to Settlement Agreement), and adopt the schedule set forth in the Declaration.

DATED: September 10, 2019                         Respectfully submitted,

_/s/ Matthew R. Wilson_                               _/s/ Henry C. Quillen_
MEYER WILSON CO., LPA                          WHATLEY KALLAS LLP
David P. Meyer (0065205)                          Henry C. Quillen (admitted *pro hac vice*)
Matthew R. Wilson (0072925)                    159 Middle St., Suite 2C
Michael J. Boyle, Jr. (0091162)                   Portsmouth, NH 03801
1320 Dublin Road, Ste. 100                        Telephone: (603) 294-1591
Columbus, OH 43215                                 Facsimile: (800) 922-4851
Telephone: (614) 224-6000                         hquillen@whatleykallas.com
Facsimile: (614) 819-8230
dmeyer@meyerwilson.com
mwilson@meyerwilson.com

KAPLAN FOX & KILSHEIMER LLP              TERRY L. KILGORE (0014692)
Laurence D. King (admitted *pro hac vice*)    1113 Northridge Oval, Bldg.13
Matthew B. George (admitted *pro hac vice*)  Brooklyn, OH 44144-3262
350 Sansome Street, Suite 400                    Telephone: (614) 648-6009
San Francisco, CA 94104                            Facsimile: (216) 600-5494
Telephone: 415-772-4700                           tksquire13@gmail.com
Facsimile: 415-772-4707
Email: lking@kaplanfox.com
Email: mgeorge@kaplanfox.com

Joel B. Strauss (admitted *pro hac vice*)        WHATLEY KALLAS LLP
850 Third Avenue                                     Joe R. Whatley (admitted *pro hac vice*)
New York, NY 10022                                 Edith M. Kallas (admitted *pro hac vice*)
Telephone:  212-687-1980                          152 West 57th St., 41st Floor
Facsimile:  212-687-7714                           New York, NY 10019
Email:  jstrauss@kaplanfox.com                   Telephone: (212) 447-7060
                                                            Facsimile: (800) 922-4851
                                                            jwhatley@whatleykallas.com
                                                            ekallas@whatleykallas.com

LAMBERT LAW FIRM, LLC                         WHATLEY KALLAS LLP
Marnie C. Lambert (0073054)                      Alan M. Mansfield (admitted *pro hac vice*)
4889 Sawmill Road, Suite 125                      16870 W. Bernardo Drive, Suite 400
Columbus, OH 43235                                 San Diego, CA 92127
Telephone: (888) 203-7833                          Telephone: (858) 674-6641
Facsimile: (888) 386-3098                          Facsimile: (855) 274-1888
                                                            amansfield@whatleykallas.com

21

CONSUMER WATCHDOG
Jerry Flanagan (admitted *pro hac vice*)
6330 San Vicente Blvd. Suite 250
Los Angeles, CA 90048
Telephone: (310) 392-0522
Facsimile: (310) 392-8874
jerry@consumerwatchdog.org

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing was filed via the Court's ECF system and was thereby served on all parties.

By:   /s/ *Matthew R. Wilson*
Matthew R. Wilson

*One of the Attorneys for Plaintiffs*